**GRANT & EISENHOFER P.A.**
M. Elizabeth Graham (Cal. Bar No. 143085)
One Market Street,
Spear Street Tower, 36th Floor
San Francisco, CA 94105
Telephone: (415) 293-8210
Facsimile: (415) 789-4367
egraham@gelaw.com

Robert Eisler (*pro hac vice* forthcoming)
Deborah Elman (*pro hac vice* forthcoming)
485 Lexington Avenue
New York, New York 10017
Telephone: (646) 722-8500
Fax: (646) 722-8501
reisler@gelaw.com
delman@gelaw.com

*Counsel for Plaintiff Marie E. Richardson*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIE E. RICHARDSON, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>SK ENERGY AMERICAS, INC.; SK TRADING INTERNATIONAL CO. LTD.; VITOL INC.; DAVID NIEMANN; and BRAD LUCAS,<br><br>                              Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff, Marie E. Richardson, on behalf of herself and all others similarly situated, files this complaint against SK Energy Americas, Inc., SK Trading International Co. Ltd., Vitol Inc., David Niemann, and Brad Lucas (collectively "Defendants") for violations of the Cartwright Act (California Business and Professions Code section 16720 *et seq.*) ("Cartwright Act") and the Unfair Competition Law (California Business and Professions Code section 17200 *et seq.*) ("UCL"). The allegations herein are based on Plaintiff's personal knowledge as to her own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of their counsel.

## I.    INTRODUCTION

1.    In February 2015, there was an explosion at a large gasoline refinery complex located in Torrance, California. A key part of the refinery complex was badly damaged and needed extensive repairs. This accident caused an unexpected shortage in the supply of refined gasoline in California, because that refinery supplied about ten percent of all the gasoline in the state.

2.    This supply disruption, which caused spikes in gasoline prices, created an opportunity for major gasoline trading firms, including Defendants SK Energy Americas, Inc. ("SKEA"), and SK Trading International Co., Ltd. ("SKTI") (together, "SK") and Vitol Inc. ("Vitol"), to conspire to fix prices. Indeed, following the explosion, SK and Vitol, which had already begun to act in concert, quickly negotiated large contracts to supply much-needed gasoline and gasoline blending components for delivery in California. The largest of these contracts exceeded 10 million gallons. Rather than competing on the merits SK and Vitol participated in a scheme to drive up and manipulate the spot market price for gasoline so that they could realize windfall profits on these large contracts to deliver gasoline and gasoline blending components.

3.      Beginning at least as early as the fall of 2014 and continuing into late 2016, the lead traders for both SK and Vitol, who were friends and former colleagues, reached agreements—with each other and with third parties—as part of a scheme to manipulate, raise, fix, and tamper with the spot market price of gasoline in California. SK and Vitol also entered into agreements with each other to share the profits and to disguise or hide the nature of the scheme.

4.      Defendants may not have created the supply disruption that impacted California starting in February 2015, but they exacerbated the effects of that disruption to enrich themselves illegally at great cost to purchasers of gasoline in California.

5.      This conduct has not gone unnoticed by government officials. On May 4, 2020, the California Attorney General filed a complaint ("AG Complaint") in San Francisco Superior Court for violations of the Cartwright Act and the UCL.[1]

6.      As a result of Defendants' anticompetitive conduct, Plaintiff and members of the Class have been injured in their business and property during the Class Period (defined below) by paying supra-competitive prices for gasoline in California. Plaintiff seeks relief under state antitrust and consumer protection laws.

## II.    JURISDICTION AND VENUE

7.      This Court has diversity jurisdiction under 28 U.S.C. §§ 1332(d) and 1367.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more Defendants reside in or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt

---

[1] The AG Complaint is available at https://www.oag.ca.gov/system/files/attachments/press-docs/Scanned%20copy%20of%20redacted%20complaint%20as%20filed.pdf.

acts in furtherance of the illegal restraint of trade throughout this District. The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

9.    This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this District.

## III.    INTRADISTRICT ASSIGNMENT

10.    Pursuant to N.D. Cal. Civil Local Rule 3-2 (c), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the trade and commerce affected by Defendants' illegal conduct was substantially conducted with, directed to or impacted Plaintiff and members of the Class in counties located within the Division. The San Francisco spot market is located within this Division.

## IV.    PARTIES

### A.    Plaintiff

11.    Plaintiff Marie E. Richardson is a California resident whose address is 716 Central Avenue, Menlo Park, California.  Plaintiff purchased fuel at retail in California during the Class Period, defined herein, for her own use and not for resale.

### B.    Defendants

#### 1.    The SK Defendants

12.    Defendant SKEA is a California corporation with its head office at 11700 Katy Freeway, Suite 900, Houston, Texas. SKEA is a wholly-owned subsidiary of SK Energy International ("SKEI"). SKEI is a Singaporean

corporation with its head office at 9 Straits View, #12-07/12 Marina One West Tower, Singapore. SKEI is the parent entity of Defendant SKEA and is itself a wholly-owned subsidiary of Defendant SKTI.

13. Defendant SKTI is a South Korean corporation with its head office at 26 Jongno, Jongno-gu, Seoul, South Korea. Defendant SKTI is the grandparent entity of Defendant SKEA and the parent entity of SKEIN. Defendant SKTI is a sister entity to SK Energy, also located in South Korea, which operates one of the largest oil refineries in the world.

14. At all times relevant to this Complaint, Defendant SKEA was an agent and alter ego of Defendant SKTI, due to the nature and extent of control that SKTI exercised over SKEA.

15. At all times relevant to this Complaint, there existed a unity of interest and ownership between the SK Defendants such that any separateness between them had ceased to exist, and SKTI controlled, dominated, managed, and operated SKEA to suit its convenience.

16. Specifically, SKTI controlled the business and affairs of SKEA such that the distinction between the companies were mere technicalities.

17. Additionally, at all times relevant to the Complaint, SKEA was acting within the course and scope of its agency with the knowledge, consent, permission, authorization, and ratification, either express or implied, of SKTI in performing the acts alleged in this Complaint.

### 2. Vitol

18. Defendant Vitol, a Delaware corporation, is a multi-billion dollar privately held energy company with its principal place of business in Houston, Texas. Vitol Holdings B.V., founded in the Netherlands, is the world's largest independent oil trading house and is the ultimate parent entity of Vitol. Vitol is registered with the California Secretary of State to conduct business in California.

### 3. David Niemann

19. During the relevant period, Defendant David Niemann was an executive of SK and was the senior trader responsible for executive trades on the U.S. West Coast, including in California. Niemann colluded with Brad Lucas from Vitol, as more fully alleged herein. On information and belief, David Niemann is a resident of Houston, Texas.

### 4. Brad Lucas

20. During the relevant period, Defendant Brad Lucas was an executive of Vitol.  Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California. On information and belief, Brad Lucas is a resident of Houston, Texas. As alleged herein, Lucas and Niemann, along with others, colluded to increase the prices of gasoline in California.

## V. BACKGROUND

### A. California's Finished Gasoline Market

21. California and the U.S. West Coast are geographically isolated from refining hubs in the rest of the United States. Indeed, while there are pipelines that connect California and other adjacent states, these pipelines only ship gasoline products out of California. There are no pipelines that ship finished gasoline products into California. Therefore, when local supplies are insufficient to meet demand in California, additional finished gasoline and gasoline blending components are typically brought into the state on marine vessels.

22. Furthering its isolation with regard to its finished gasoline market, California's vehicle emissions standards—the California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB")—are more stringent than those of the rest of the country. Thus, gasoline used in neighboring states generally does not meet CARBOB specifications and cannot be used as a substitute source of supply. Non-CARBOB gasoline such as Reformulated Gasoline Blendstock for

Oxygenate Blending ("RBOB") is generally less expensive to produce than CARBOB (but does not meet California's emissions standards).

23.   Most of the CARBOB consumed in California is produced locally by refineries located in clusters near metropolitan centers in Northern California and Southern California.   Absent supply disruptions, California refineries have production capacities that meet or exceed statewide demand.

24.   Gasoline refineries are complex operations that require extensive maintenance on pre-planned or scheduled time intervals to assure operating reliability and to meet operating requirements. For scheduled maintenance, a gasoline refinery or parts of the refinery are shut down for what are referred to as "planned turnarounds." Planned turnarounds usually have little impact on the price of gasoline, as refineries build up inventories or arrange for alternate supply in advance of a planned turnaround to offset the reduced production during the shutdown period.  "Unplanned outages," conversely, are unexpected problems that occur during refinery operations. During an unplanned outage, a gasoline refinery or parts of the refinery are shut down with little or no advance notice, and thus, there is an unanticipated reduction in the production of that refinery without an offsetting buildup of supply; this can increase the price of gasoline.

25.   When unexpected supply disruptions occur, it can be difficult to find immediate alternative sources of supply due to California's stringent CARBOB specifications and relative geographic isolation. Market participants frequently turn to imports brought in by ship to make up for shortfalls, but there can be a significant time lag due to transit time. For example, ships carrying CARBOB or other blendstocks from refineries in Asia can take several weeks or more to arrive in California.

**B.** **Spot Market Trading**

**1.** **Gasoline Spot Market Trading in California**

26.    Market participants buy and sell gasoline for physical delivery within a short timeframe on "spot markets." There are various spot markets in the United States in which gasoline and other fuels are traded. Two of the spot markets are in California: one is in San Francisco for delivery in Northern California; the other is in Los Angeles for delivery in Southern California.

27.    Spot markets are referred to as "'physical" markets because market participants use them to obtain supplies of actual product. As a result, physical markets are located at or near refinery hubs, and the trades consummated on the spot market designate a delivery location and delivery timeframe. Spot market transactions that provide for nearly immediate delivery after the execution of the trade are called "prompt" trades.

28.    The prices on the two California spot markets are greatly influenced by the prices on the New York Mercantile Exchange ("NYMEX"). The NYMEX is a futures market for delivery of gasoline to New York Harbor. It is sometimes called a "paper market" rather than a physical market because market participants close most futures transactions before making or taking physical delivery. Prices on the NYMEX are determined in a centralized market: there are typically thousands of gasoline trades on the NYMEX amounting to billions of gallons on every trading day. Further, all transactions on the NYMEX are publicly reported, so pricing is transparent to market participants.

29.    NYMEX prices are for RBOB, not CARBOB, so the California spot market price is usually, but not always, higher than the NYMEX. That difference in prices—referred to as a "spread," the "basis," or the "differential"—between CARBOB and RBOB, whether positive or negative, is expressed in cents per gallon.

30.    The NYMEX prices generally reflect large-scale national and international factors, while the California spot markets react to the NYMEX price as well as to regional and local supply and demand conditions. In many California spot market transactions, the buyer and the seller negotiate only the basis, which is what is added to or subtracted from the NYMEX price.

31.    Spot market deals in California generally range between 420,000 gallons (10,000 barrels) to 2.1 million gallons (50,000 barrels). The spot market price is the largest component of the price on the wholesale "rack market," which is typically sold in gasoline truck volumes of about 8,000 gallons (approximately 190 barrels). The price at the rack market is typically reflected in the retail price within a couple of days.

32.    There are two common grades of CARBOB consumed in California and traded on the spot market: regular CARBOB ("Regular"), which is the most commonly traded grade of gasoline, and premium CARBOB ("Premium"), which is traded with far less frequency and at a higher price.

33.    Alkylate is a high-quality gasoline blending component that can be combined with other blendstocks to create Regular and, more often, Premium.

**2.    Spot Market Price Reporting in California**

34.    Unlike the NYMEX, spot market trades in California for both Regular and Premium are traded through non-public transactions, sometimes called over-the-counter ("OTC") trades. These OTC transactions do not occur on a centralized open exchange like the NYMEX, so prices on the California spot markets are not immediately public. Instead, market participants rely on price-reporting services that report spot market prices from sources that participate in the market, such as traders, refiners, and brokers.

35.    The Oil Price Information Service, LLC ("OPIS") is the most widely used reporting service in California. OPIS is a subscription service that publishes a daily OPIS West Coast Spot Market Report (the "Spot Market Report"), which

is the industry pricing benchmark used by both buyers and sellers in California. Subscribers to OPIS get the Spot Market Report and can also receive market updates from OPIS throughout the day, which include required deal and other industry news.

36.     Price reporting by OPIS plays a crucial role in certain types of gasoline contracts that use a "floating price" determined at a future date as indicated in the contract. The parties agree on a differential above or below the spot price or prices published by OPIS. These floating price contracts can be tied to the future price of Regular or Premium as reported by OPIS in the Spot Market Report.

37.     The future dates on which the floating price in the contract is set are often referred to as "pricing windows." The pricing window can be an agreed-upon date or a date range. Pricing windows can also be tied to the dates of delivery or other conditions as indicated in the contract.

38.     Market participants voluntarily submit information on their trades to OPIS, which calculates a daily spot price by, among other things, aggregating the reported trades. Therefore, the reporting of trades is a critical component of how OPIS calculates the daily spot prices.

39.     The Spot Market Report includes, among other gasoline products, the prices for Regular and Premium gasoline contracts for prompt (i.e., near term) delivery in Southern California and in Northern California. The Spot Market Report also contains forward prices for Regular and Premium delivery in upcoming future months.

40.     On a daily basis, there are usually many more Regular trades than Premium trades listed in the Spot Market Report. For example, there could be 5, 10, 15, or more Regular trades reported on one day compared to one or no Premium trades. Because trading in Premium is less common than Regular, a single

Premium trade reported to OPIS tends to have a bigger impact on the spot market price than a single trade of Regular.

### 3. Californoa Rules Governing Spot Market Trading in California

41. In California, fraudulent gasoline spot market trading is covered by California's commodities fraud statute. (Corp. Code § 29504 (defining "commodities")). Under the commodities fraud statute, when buying or selling commodity contracts, it is unlawful to engage in certain fraudulent acts. (See Corp. Code § 29536, subds. (a), (b), (c), (d)).

42. Specifically, under section 29536(c), it is unlawful to "[t]o willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons." (Corp. Code § 29536, subd. (c)).

43. In addition to the California commodities fraud statute, the federal Commodity Exchange Act makes unlawful certain types of "[p]rohibited transactions." (7 U.S.C. § 6c.) More specifically, the Commodity Exchange Act prohibits a transaction that "is, of the character of, or commonly known to the trade as, a "wash sale" or "accommodation trade." (7 U.S.C. § 13 6c(a)(2)(A)(i).)

44. The Commodity Exchange Act also prohibits a transaction that "is used to cause any price to be reported, registered, or recorded that is not a true and bona fide price." (7 U.S.C. 16 § 6c(a)(2)(B)).

## VI. DEFENDANTS' PARTICIPATION IN THE CALIFORNIA SPOT MARKET

### A. SK's U.S. West Coast Trading Operation

45. During the relevant period, SK was an active participant in trading gasoline in California. SK bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

46.     SK imported gasoline and gasoline blending components (such as alkylate) into California.

47.     SKEA employee David Niemann ("Niemann") was the senior trader responsible for executing trades on the U.S. West Coast, including California. Another SKEA employee, Shelly Mohammed ("Mohammed"), held the role of gasoline scheduler and was Niemann's subordinate.

48.     SKEA functioned as the California trading arm of SKTI. While Niemann and Mohammed were nominally employees of Defendant SKEA, SK's U.S. West Coast Trading Operation was conducted within the continuous and pervasive control and supervision of SKTI, acting for itself and through its wholly-owned subsidiary, SKEI.

49.     As discussed in more detail below, SKTI also specifically reviewed and approved key decisions to coordinate certain trading activities with Vitol.

**B.     Vitol's U.S. West Coast Trading Operation**

50.     During the relevant period, Vitol was an active participant in trading gasoline in California. Vitol bought and sold spot market contracts for various types of fuel products, Regular and Premium.

51.     Vitol imported gasoline and gasoline blending components (such as alkylate) into California.

52.     Vitol employee Brad Lucas ("Lucas") held the title USWC Trader. Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components delivered via pipeline within California.

53.     Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas. In addition to supervising Lucas, Addison also had trading responsibility that included trading gasoline and gasoline blending components that were delivered primarily via marine vessels to locations in the U.S. West Coast, including California.

**C.    SK and Vitol Begin Coordinating Even Before the Explosion**

54.    Starting or around November 1, 2014, SK and Vitol reached an agreement to coordinate or cooperate in regards to certain trading activities on the United States West Coast, including activity in California. SK and Vitol took steps to conceal the nature of these agreements from other market participants.

55.    Notably, SK hired Niemann in August 2014, and Niemann immediately began trading gasoline contracts on the California spot market. Before being hired by SK, Niemann held a similar role at Vitol for approximately ten years. Niemann and Lucas overlapped at Vitol, and even after leaving Vitol, Niemann maintained connections with Lucas and others at Vitol.

56.    When SK and Vitol started conspiring in late 2014, there was ample supply in the California market, and spot market prices for Regular were at or below the NYMEX price for RBOB for much of November and December 2014.

57.    In February 2015, Lucas and Niemann expanded the conspiracy to include Premium.

58.    By February 2015, Niemann was the senior trader for SK with responsibility for California trading, Lucas had the same role with Vitol, and their respective firms were competitors in the California gasoline market.

59.    For the duration of the scheme alleged more fully below, Niemann of SK and Lucas of Vitol conspired with each other and reached agreements through multiple means of communications, including instant messaging, emails, and telephone calls, as well as in-person meetings, dinners, and drinks.

60.    While market participants may have perceived SK and Vitol as competitors, the two companies were in fact working together. Despite the terminology used, their "joint ventures," described more fully below, were a sham or pretext for the two to conspire and were a method of engaging in prearranged transactions and avoiding competition.

**VII.  DEFENDANTS' CONSPIRACY EXPANDED FOLLOWING THE FEBRUARY 2015 EXPLOSION AT THE TORRANCE REFINERY**

**A.    The Explosion**

61.    During the morning hours of February 18, 2015, there was a large explosion at the Torrance Refinery, one of the largest refineries in Southern California, which, at the time, was owned by Exxon Mobil Corp. ("ExxonMobil"). The Torrance Refinery produces approximately 20 percent of all of the gasoline sold in Southern California (and ten percent of the statewide supply).

62.    The blast, which caused significant damage to the refinery and was felt in the surrounding community, occurred in the fluid catalytic cracking ("FCC") unit—a key part of a refinery complex that produces gasoline and related high-value products like alkylate. The Torrance Refinery's FCC unit was particularly important because it produced a significant portion of all the high-octane alkylate produced in California. Thus, the alkylate produced at the Torrance Refinery was a key gasoline blending component for Premium produced in California.

63.    The Torrance Refinery immediately shut down the FCC unit and reduced production of gasoline products, including alkylate, as repair efforts and a federal investigation into the explosion commenced. As a result of this unplanned outage at the Torrance Refinery, ExxonMobil needed to replace a significant amount of lost gasoline and alkylate production in Southern California to fulfill its supply needs.

**B.    The Scheme to Fix and Manipulate the California Spot Market Price**

64.    Following the explosion, and after recognizing the severe finished gasoline shortage that would result from the events at the Torrance Refinery, beginning at least as early as late February 2015, SK and Vitol reached agreements with each other and with third parties as part of their ongoing scheme to raise, fix, and manipulate the price of finished gasoline in California by using various tactics.

A core element of the scheme was manipulating the OPIS-reported price during pricing windows for large contracts. The goal of the scheme was simple: to drive up or stabilize the OPIS-reported price during pricing windows and to realize unlawfully inflated profits while limiting bona fide market risk.

65.    Although SK and Vitol used tactics during the scheme that were varied and often complex, there were two primary components: (1) engage in trades that were reported to OPIS for the purpose of inflating the OPIS-published price in the Spot Market Report and (2) execute facilitating trades to hide or disguise the nature of the scheme, to limit or eliminate bona fide market risk on the reported trades, and to share profits with each other.

### 1.    OPIS-Reported Trades

66.    As a core component in the scheme, SK and Vitol, through their employees Niemann and Lucas, engaged in trades to move up or inflate the OPIS-reported price during the pricing windows for large contracts. During these key date ranges, Defendants engaged in selectively reported transactions and loss-leader transactions that were reported to OPIS to drive up, stabilize, or arrest the decline of the OPIS-reported price. Sometimes they used the services of an intermediary broker, and sometimes they transacted directly. Defendants also, at times, made strategic bids to buy and offers to sell at prices calculated to impact the OPIS price assessment.

67.    Many of the loss-leader transactions were "leveraged" because they involved taking losses on the purchase of smaller quantities of gasoline to increase the profits on the sale of larger quantities of gasoline or alkylate by artificially increasing the OPIS-reported price. While the individual market-moving transactions were often uneconomic, Vitol and/or SK realized a price increase on the larger floating price contracts (the leveraged side) that more than made up for any losses on the smaller loss-leader transactions.

68.     These leveraged/loss-leader transactions could take different forms. One tactic used by Defendants when trading Regular was to transact the high deal of the day when the deal was reported to OPIS. This had the effect of bidding up the OPIS-reported price, as OPIS reported purchases at increasingly higher prices. Sometimes, this deal was the absolute highest deal of the day; other times, subsequent deals pushed the price even higher. By transacting the high deals, Defendants moved up the average of the OPIS Spot Market Report and created the impression to other market participants that there was strong demand, including demand at higher than prevailing market prices.

69.     A similar tactic when trading Regular was to transact the first deal of the day at an inflated price during key pricing windows so that OPIS would report an inflated purchase price to other market participants. An early purchase at an inflated price signaled artificially high demand, thereby discouraging would-be sellers from submitting offers to sell below that price. 70.

70.     As described above, Premium traded far less often than Regular, and on many days, no Premium deals at all were reported to OPIS. Accordingly, another tactic used was to execute a market-spiking trade for Premium, which was reported to OPIS. Given the low volume of Premium trades, a single Premium trade reported to OPIS could have a significant impact on the spot market price. Although the trades might appear to have been uneconomical, Defendants made them for Premium during the pricing windows for large sales of alkylate. While alkylate is a key blending component for Premium, alkylate is not a separately reported commodity on California's spot markets. Consequently, large floating price contracts for alkylate were most commonly tied with a small differential to the OPIS-reported price for Premium during the associated pricing window. Therefore, to realize unlawfully inflated profits on alkylate contracts, Defendants conspired to inflate the price of Premium during key pricing periods.

71.     There were also scenarios, however, where Defendants conspired to inflate the price of Regular to advantage floating-price contracts for alkylate because those contracts were directly tied to the price of Regular or as part of a strategy to increase prices of both Regular and Premium, which often rise in tandem.

**2.     Facilitating Trades**

72.     As another component of their scheme, Defendants executed facilitating trades related to the OPIS-reported transactions referenced above. These facilitating trades were executed for various purposes, including to hide or disguise the nature of the scheme, to limit or eliminate bona fide market risk on the reported trades, and to share profits with each other. Facilitating trades were executed at the same time, before, or after the OPIS-reported trades. SK and Vitol executed these facilitating trades with each other and with third parties.

73.     For example, Defendants conducted a second trade in the opposite direction of the OPIS-reported trade. This type of round-trip or round-turn facilitating trade, sometimes called a "wash trade," effectively negated the volume of gasoline purportedly exchanged in the OPIS-reported trade.

74.     To hide the manipulative nature of the reported trade from OPIS and the wider market, often the facilitating trade was not reported to OPIS. The second trade ensured that no gasoline actually changed hands as a result of the OPIS-reported trade that inflated the price reported in the Spot Market Report.

75.     By moving in the opposite direction of the reported trade, the facilitating transaction ensured that there was little or no market risk associated with the reported transaction. Many of the facilitating trades—sometimes called "accommodation" or "prearranged" trades—appear to have been preplanned. The facilitating trades often had the effect of locking in a loss but also limiting the total exposure that Defendants faced as result of the reported transactions.

76.    The facilitating trades occurred before or after the reported trade. For example, prior to a pricing window, Vitol and/or SK took preplanned "short" positions, ensuring that they would need to buy during the pricing window. Therefore, when Defendants went on buying sprees that pushed up the OPIS-reported prices during the pricing windows, it would appear to other participants that there was an increase in demand, but in fact the demand was preplanned and artificial.

77.    Another facilitating tactic was to engage in unreported trades as a means of sharing profits from the scheme. In this way, Defendants entered into prearranged buy and sell contracts with each other, thereby transferring money rather than actual gasoline. These contracts often deviated from the prevailing market price and, therefore, were uneconomic.

78.    As a means of sharing profits and aligning incentives to artificially increase the market price, SK and Vitol also entered into contracts with each other designed to share in the unlawfully inflated profits earned from manipulating the floating price contracts. These agreements were called "Joint Ventures" or "JVs." However, they were nothing more than secret agreements between the Defendants to facilitate their scheme.

### 3.    SK and Vitol Expand the Agreements to Include Alkylate

79.    Although the conspiracy between SK and Vitol began with Regular gasoline in late 2014 and then expanded to include Premium in February 2015, at some point in mid- to late- 2015, SK and Vitol expanded their so-called "Joint Ventures" to include alkylate cargoes. Under the alkylate agreement, SK or Vitol imported a cargo of alkylate and then conspired to boost the profits from selling the alkylate while seeking to conceal the conspiracy.

80.    The agreement to share the profits of the alkylate cargoes was a crucial component of the scheme. As discussed above, Defendants engaged in market-spiking trades during the pricing windows for large sales of alkylate.

Therefore, when SK and Vitol shared the profits from the alkylate cargoes, it aligned their incentives to inflate the OPIS-reported prices during the pricing window for that alkylate.

## VIII.   THE   UNLAWFUL   SCHEME   HARMED   CALIFORNIA   CONSUMERS

81.    Defendants were effective in carrying out their scheme. During key pricing windows, they artificially moved and inflated the price of Regular and Premium.

82.    In the most egregious examples, Defendants manipulated Regular and Premium prices so effectively that those prices moved higher or stayed higher to a degree that is nearly inexplicable when compared to the supply and demand fundamentals prevailing at the time of the pricing windows.

83.    Defendants' manipulation of the gasoline markets harmed consumers because the spot market price translates to the "rack" market prices, which are the wholesale prices paid when a gasoline tanker truck is filled up. Inflated rack market prices then directly translate into inflated prices in the retail market and ultimately into the price paid at the service station pump.

84.    The following chart, published by Severin Borenstein, chair of the PMAC—which was formed to investigate gasoline pricing in California between late 2014 and the end of 2016—depicts the historically unprecedented change in gasoline pricing in California that was caused by, and lingered, as a result of Defendants' conduct:[2]

---

[2] See "California's Mystery Gasoline Surcharge Continues," Energy Institute at HAAS, available at https://energyathaas.wordpress.com/2018/02/26/californias-mystery-gasoline-surchargecontinues/.

1

2

3

4

5

6

7

8

9

10

11

12

13



14       85.    Consistent with the above, the following chart reveals erratic pricing

15 around the time of the Torrance Refinery explosion for weekly gas prices in Los

16 Angeles:[3]

17

18

19

20

21

22

23

24

25

26

27

28



86.     Similarly, the following chart demonstrates inflated gasoline prices in California compared to the rest of the United States beginning around the time of the Torrance Refinery explosion:[4]



87.     A 2017 report explains that after the explosion, prices went up, "[b]ut when the Torrance refinery came back online, a funny thing happened: prices came down, but not to their previous level. For some reason, California gasoline now costs about 57 cents more than the national average."[5]

88.     The spot market price spikes were not explained by any actual decrease in gasoline production following the Torrance Refinery explosion. As the PMAC's Final Report explained, "Energy Commission staff noted that while the ESP tower and FCCU of the refinery remained offline until June 2016, the refinery

---

[3] Data provided by U.S. Energy Information Administration, *available at* https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMM_EPM0_PTE_Y05LA_D PG&f=W.

[4] See "Chart of the Day: California's Mysteriously High Gasoline Prices," Mother Jones, available at https://www.motherjones.com/kevin-drum/2017/11/chart-of-the-day-californias-mysteriously-high-gasoline-prices/.

[5] *Id.*

---

1 could still create finished gasoline from processed blending components, some of
2 which may be imported."[6]

3     89.    In fact, the PMAC demonstrated that overall gasoline production in
4 California was well within the historical five-year production band immediately
5 following the Torrance Refinery explosion and for the remainder of 2015, as
6 depicted in the following chart:[7]

7
8
9
10
11
12
13
14
15
16
17
18
19



20

21     90.    The following chart demonstrates that Defendants' spot price
22 manipulation, which was in full swing not later than February 2015, impacted
23
24
25

26 [6] See "Petroleum Market Advisory Committee Final Report," California Energy Commission,
available at https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-
27 13/Item_01a.pdf, at p. 12.

28 [7] *Id.*

CARBOB spot prices in both San Francisco and Los Angeles, whose markets move in tandem:[8]



91.    Spot price manipulation affects gasoline prices at all retail outlets, whether they supply branded or unbranded gasoline (i.e. gas sold by retail discounters like Arco, Safeway, and Costco). In fact, the PMAC demonstrated that prices for branded and unbranded gasoline move in tandem, with branded pricing slightly higher than unbranded pricing.[9]

---

[8] See "Data on California Gasoline Price Margins," California Energy Commission, available at https://www.energy.ca.gov/sites/default/files/2019-05/Data_on_California_Gasoline_Price_Margins.pdf, at p. 5.

[9] See "Petroleum Market Advisory Committee Final Report," California Energy Commission, available at https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf at p. 29.





Figure 15: Average Retail California Regular Gasoline Prices by Branded and Unbranded Retail Sectors, 2007 to 2016

Branded Retailers include: Chevron, 76, Shell, Exxon, & Mobil

UnBranded Retailers include: All other Brands

BRD_CA REGULAR GRADE GASOLINE EX-TAX    UBRD_CA REGULAR GRADE GASOLINE EX-TAX
BRANDED - UNBRANDED (2nd Axis)

Source: California Energy Commission analysis of OPIS information

92.    Furthermore, the harm to consumers was not limited to the pricing windows. The repeated exercise of inflating the spot market price over time had residual impacts on the spot market prices even outside of the pricing windows specified in the contracts. Thus, the unlawful agreements and spot market manipulation applied throughout the California gasoline market such that consumers paid more than they should have at retail gas stations.

93.    SK and Vitol both reaped extraordinary and unlawfully inflated profits off the backs of purchasers of gasoline in California, which was foreseeable, as California trading generated millions of dollars of profits per month; Niemann of SK and Lucas of Vitol personally shared in this windfall.

94.    While the precise end date of the scheme is not yet known, the illegal conduct continued into 2016. The scheme likely terminated at or around the time that Niemann left SK in late 2016.

## IX.    CALIFORNIA ATTORNEY GENERAL COMPLAINT

95.    On May 4, 2020, the California Attorney General filed suit in San Francisco Superior Court, alleging the same manipulation of the gasoline spot market in California.

96.     The suit followed on the heels of a non-public investigation into the causes of gasoline prices following the Torrance Refinery explosion. That investigation uncovered secret evidence that Defendants had illegally colluded with each other and third parties to increase the price of gasoline to levels above what competition would have allowed.

## X.     PLAINTIFF'S CLAIMS ARE TIMELY

97.     Plaintiff's Cartwright Act and Unfair Competition Law claims are both subject to a four-year statute of limitations. However, for several reasons, Plaintiff's claims are timely.

### A.     Tolling

98.     The California Attorney General, as representative of the people of the State of California, obtained tolling agreements with Defendants that are applicable to the claims of Plaintiff and the Class, in whole or in part. These tolling agreements have effective dates of August 3, 2018, and March 8, 2019, respectively. Defendants and the California Attorney General subsequently executed additional tolling agreements to extend the termination dates of the tolling periods specified in the original agreements. These termination dates have not passed as of the filing of this Complaint.

### B.     Fraudulent Concealment

99.     Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct.

100.   For example, Lucas affirmatively mislead the California Energy Commission ("CEC") about the true cause of high prices for gasoline that followed the Torrance Refinery explosion in February 2015. On August 16, 2016, he told the PMAC, including Kathleen Foote, Senior Assistant Attorney General and Chief of the Antitrust Division, that high gasoline prices were caused by a lack of transparency by ExxonMobil, rather than Defendants' illegal manipulation of spot market prices. Lucas stated:

So you know, last year we brought in quite a few cargos into L.A., both alkaloid (phonetic) and finish CARBOB that went through Kinder Morgan's system and sold direct to Exxon and some other refiners. You know, one of the big things that this whole conversation has entailed is about the high prices. One of the reasons why, in my opinion, was the lack of transparency with what was going on with Torrance. Because if you remember when it first blew up back in February, there was like an eternal rolling one-month period where they were going to get back up and running. And they kept saying next month, next month, next month. So the trading companies in general, it takes four to five weeks to ship a cargo out, if Exxon is coming back up they're not going to ship into closed ARB. So because there was no real timeline of when Exxon was going to come back up and running, we would generally not—you don't put cargos on the water and ship them to the West Coast just on a punt, basically, hoping that you can sell them when they get there. That's what happened with that one cargo that was done by another trading company who sent it out there, at which point in time the market had collapsed, and so he was unable to sell it, and so he sailed it away again. So that's what happened with that one. So if there was more transparency with what was going on with refinery maintenance, when it was going to come back up, it would have allowed us to see if it was more—if we were going to be able to land these cargos and actually into a competitive market. If Exxon is back up and running the market is going to fall dramatically. So basically kind of that lack of information kept cargos at bay. There were still a lot shipped into the West Coast, but not as many as could have been or would have been done. If we had actually known that Exxon was going to be down for over a year there would have been a much bigger import play over that time frame.[10]

101.   Defendants also misled OPIS about the true nature of their trading activities by reporting artificially high spot trades directly or indirectly between them, while at the same time concealing the wash trades that reduced any market risk in the primary trade.

---

[10] *See* Petroleum Market Advisory Committee, Transcript, August 16, 2016 Meeting, available at https://www.energy.ca.gov/data-reports/planning-and-forecasting/petroleum-market-advisory-committee, at pp. 129:24-131:10.

102.   Neither Plaintiff nor members of the Class had actual or constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Defendants' scheme, or any facts that might have led to the discovery of the scheme, any earlier than May 4, 2020.

103.   Plaintiff could not have discovered these violations earlier in time because Defendants conducted their scheme in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

104.   Defendants engaged in an unlawful market manipulation scheme, which they affirmatively concealed by, among other things, engaging in trades that were reported to OPIS to artificially inflate the OPIS-reported benchmark price (published in OPIS's Spot Market Report) without revealing that Defendants were parties to the trade, and then executing related trades that were not reported to OPIS to disguise the nature of their scheme, to limit potential losses on reported trades, and to share profits with one another. This scheme was, by its very nature, self-concealing. As a result of the fraudulent concealment of the scheme, Plaintiff asserts the tolling of the statute of limitations otherwise applicable to Plaintiff's claims.

## XI.   CLASS ACTION ALLEGATIONS

105.   Plaintiff brings this action on behalf of herself and all others similarly situated as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> All persons or entities that purchased gasoline within the State of California from November 1, 2014 through December 31, 2016 (the "Class Period").

106.   The following persons and entities are excluded from the above-described proposed Class:

> (i)   Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;
>
> (ii)   All governmental entities;
>
> (iii)   All Counsel of Record; and
>
> (iv)   The Court, Court personnel, and any member of their immediate families.

107.   Members of the Class are so numerous and dispersed that joinder of all members of the Class is impracticable. Plaintiff does not know the exact number of Class members but, on information and belief, allege that there are millions of Class members throughout California.

108.   Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for gas as a result of Defendant's unlawful conduct and were deprived of the benefits of competition.

109.   Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of members of the Class.

110.    Plaintiff is represented by counsel with experience in the prosecution of complex class action antitrust litigation.

111.   Questions of law and fact common to members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

112.   Questions of law and fact common to the Class include:

(i)    Whether Defendants contracted, combined or conspired with one another to restrain trade in the spot market for gasoline at any time during the Class Period;

(ii)   Whether Defendants' conduct caused the prices of gasoline in California to be higher than the competitive level as a result of their restraint of trade;

(iii)  Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate classwide measure of damages; and

(iv)  Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

113.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

114.   Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## XII.   CLAIMS FOR RELIEF

### COUNT I

### Violation of the Cartwright Act

### (California Business and Professions Code section 16720 *et seq.*)

115.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein. Plaintiff brings this claim against all Defendants.

116.   Beginning at a time presently unknown to Plaintiff, but at least in or around November 1, 2014, and continuing at least through the end of 2016, Defendants entered into and engaged in an unlawful trust in restraint of trade and commerce, as described above, in violation of California Business and Professions Code section 16720 *et seq.* ("Section 16720").

117.   This scheme consisted, without limitation, of a continuing agreement, understanding, or conceding of action among Defendants, the substantial terms of which were to fix, maintain, control, increase, inflate, tamper with, or otherwise manipulate and make artificial the benchmark prices of Regular and Premium that OPIS published in its Spot Market Report to market participants. At all relevant times, Defendants were competitors in this market.

118.   For the purpose of forming and effectuating the unlawful trust, Defendants:

- Engaged in trades with each other and with third parties that were reported to OPIS for the purpose of fixing, maintaining, controlling, increasing, inflating, tampering with, or otherwise manipulating and making artificial, the benchmark prices of Regular and Premium published in OPIS's Spot Market Report in order to profit on other OPIS-based positions Defendants maintained;

- Executed facilitating trades to hide or disguise the nature of their market manipulation scheme, to limit or eliminate bona fide market risk on the reported trades, and to share ill-gotten profits amongst themselves; and

- Entered into anticompetitive agreements with each other.

119.   The scheme has had, among other things, the following effects:

- Affected the value of contracts for Regular, Premium, and alkylate that were based on artificially inflated benchmark prices;

- Suppressed competition among Defendants for the purchase and sale of Regular, Premium, and alkylate; and

- Affected the wholesale and retail market prices for Regular and Premium in California, which are based on and affected by California spot market prices.

120. Defendants' scheme constitutes a per se violation of Section 16720.

121. Defendants' scheme was carried out and effectuated within the State of California and the resulting impact on California's spot, wholesale, and retail markets for finished gasoline, caused by Defendants' unlawful conduct, injured natural persons in this State.

122. As a result of Defendants' violations of Section 16720, Plaintiff and members of the Class were injured in their business and property in that they paid more for gasoline in California than they would have in the absence of Defendants' unlawful conduct.

123. Accordingly, Plaintiff brings this class action pursuant to California Business and Professions Code section 16750(a) and seeks, on behalf of herself and members of the Class, treble damages and injunctive relief.

## COUNT II

### Violation of the Unfair Competition Law

### (California Business and Professions Code section 17020 *et seq.*)

124. Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein. Plaintiff brings this claim against all Defendants.

125. Beginning at a time presently unknown to Plaintiff, but at least in or around November 1, 2014, and continuing through 2016, Defendants committed acts of unfair competition, a described above, in violation of California Business and Professions Code section 17200 (hereafter "Section 17200").

126. Defendants' unlawful, unfair, or fraudulent business acts or practices, as described above, constitute unfair competition within the meaning of Section 17200, and include, without limitation, the following:

- Violating Section 16720, as set forth above;

- Engaging in wash sales, accommodation trades, prearranged trades, and transactions made for the purpose of manipulating the benchmark prices reported on the California gasoline spot market, all in violation of California's commodities fraud statute (Corp. Code, §§ 29535, 29536, 29537, 29538) and the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).

127.   As a result of Defendants' violations of Section 17200, Plaintiff and members of the Class were injured in their business and property in that they paid more for gasoline in California than they would have in the absence of Defendants' unlawful, unfair, or fraudulent conduct.

128.   Accordingly, Plaintiff brings this action pursuant to California Business and Professions Code section 17200, on behalf of herself and members of the Class, and seeks injunctive relief and restitution pursuant to California Business and Professions Code section 17203.

## XIII.   PRAYER FOR RELIEF

129.   WHEREFORE, Plaintiff requests that the Court enter judgment on their behalf and on behalf of members of the Class defined herein, by adjudging and decreeing that:

A.   Defendants' contracts, agreements, or combination constitutes an illegal restraint of trade in violation of the Cartwright Act, section 16720 *et seq.* of the Business and Professions Code;

B.   Defendants' acts violate the Unfair Competition Law, section 17200 *et seq.* of the Business and Professions Code;

C.   Plaintiff and members of the Class have been injured in their business and property as a result of Defendants' violations;

D.   Plaintiff and members of the Class are entitled to recover trebled damages and/or restitution, and that a joint and several judgment in

favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

E.     Plaintiff and members of the Class be awarded pre- and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.     Plaintiff and members of the Class are entitled to equitable relief by which the Court enters all orders necessary to prevent Defendants, as well as Defendants' successors, agents, representatives, employees, and all persons who act in concert with Defendants from engaging in any act or practice that constitutes a violation of the Cartwright Act, section 16720 *et seq.* of the Business and Professions Code or the Unfair Competition Law, section 17200 *et seq.* of the Business and Professions Code, including such mandatory injunctions as may be reasonably necessary to restore and preserve fair competition;

G.     Plaintiff recovers her costs and reasonable attorneys' fees; and

H.     Plaintiff and members of the Class receive any other legal and equitable relief as the Court may deem just and proper, including such other relief as the Court may deem proper to redress, and prevent recurrence of, the alleged violation in order to dissipate the anticompetitive effects of Defendants' violations, and to restore competition.

## XIV.  JURY TRIAL DEMAND

130.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint that are so triable.

1  Dated:  June 3, 2020

2                                    **GRANT & EISENHOFER P.A.**

3

4

5  By _/s/ M. Elizabeth Graham_
   M. Elizabeth Graham
6  (Cal. Bar No. 143085)
   One Market Street
7  Spear Street Tower, 36th Floor
   San Francisco, CA 94105
8  Telephone: (415) 293-8210
   Facsimile: (415) 789-4367
9  egraham@gelaw.com

10 Robert Eisler (_pro hac vice_ forthcoming)
11 Deborah Elman (_pro hac vice_
        forthcoming)
12 485 Lexington Avenue
   New York, New York 10017
13 Telephone: (646) 722-8500
   Fax: (646) 722-8501
14 reisler@gelaw.com
   delman@gelaw.com
15

16 _Attorneys for Plaintiff Marie E._
        _Richardson_
17

18

19

20

21

22

23

24

25

26

27

28